ORIGINAL

FILED
AUG 2 3 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT<br>2600 Centre Square West<br>1500 Market Street<br>Philadelphia, PA 19102-2126 | ) | |
| Plaintiff, | ) | No. 07-628 C |
| v. | ) | Judge: |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## COMPLAINT

COME NOW, Plaintiff Philadelphia Authority for Industrial Development, by its undersigned attorneys, and for its complaint against Defendant the United States of America, seeks monetary damages and other relief on its claims, and for grounds therefore states as follows:

## THE PARTIES

1. Plaintiff Philadelphia Authority for Industrial Development ("PAID") is a Pennsylvania non-profit Corporation with its principal place of business at 2600 Centre Square West, 1500 Market Street, Philadelphia, PA 19102-2126. PAID entered into a contract with the United States of America on August 31, 2001. The contract is the subject of this action.

2. Defendant The United States of America (the "Government") is a party to the contract at issue, acting by and through the United States Department of Navy, Atlantic Division, Naval Facilities Engineering Command.

#8812340 v2

## JURISDICTION

3. This suit seeks *de novo* review of the Contracting Officer's denial of certain certified claims by PAID. This Court has jurisdiction over this action pursuant to § 10 (a) of the Contract Dispute Act of 1978 (41 U.S.C. § 609(a)) ("CDA") and 28 U.S.C. § 1491.

4. On September 1, 2005 PAID submitted a Request for Equitable Adjustment to the Navy in the amount of $3,449,328.80.

5. The Contracting Officer denied PAID's Request for Equitable Adjustment on November 15, 2005.

6. PAID requested the Contracting Officer's final decision on November 28, 2005 which was properly certified on December 7, 2005.

7. On February 8, 2007 Miss Kimberly F. Ribaudo of the U.S. Department of the Navy, Atlantic Division, Acquisition Department Contracting Officer, issued a final decision denying PAID's claim.

## FACTS

8. PAID entered into a contract with Atlantic Division, Naval Facilities Engineering Command (The "Navy") on August 31, 2001. The contract, N62470-99-C-3633, is for the purchase of certain utility services for Navy's facilities at the Philadelphia Naval Business Center, now known as the Navy Yard, particularly electric service, steam service, and water and sanitary sewer service (the "Contract"). The Contract is the subject of this action.

9. In relevant part, the Contract states, "the Contractor shall furnish and the Government shall purchase Utility Services (hereinafter called SERVICES) requested by the Government from the Contractor at the premises to be served hereunder (hereinafter called SERVICE LOCATIONS), in accordance with the General Provisions and the Service Specifications, Exhibit B, as to Steam Service...".

10. Exhibit B to the Contract provided specific Steam Service Locations (STM-1 through STM-28) and the Steam Service Specifications. Under Section 2 of each of the twenty-eight (28) Service Locations, the Contract provided estimated service requirements consisting of annual consumption and hourly maximum demand of steam.

11. The estimates provided in Exhibit B to the Contract were provided by the Government with no input from PAID. The projected steam consumption provided by the Government proved grossly inaccurate and is the basis of PAID's claim.

12. By way of background, for over 100 years, the Naval Base, Naval Station and Shipyard were fully operational. The Navy owned and operated the electrical and water/sewer distributions systems as a completely separate system from the distribution systems of PECO and the Philadelphia Water Department, although the Navy purchased water and electricity from those utilities. In addition, the Navy operated a central steam plant that provided heating for the Navy buildings throughout the 1200 acre site. This plant also provided steam used for industrial processes at several buildings and at all the dry docks and piers where steam was provided to ships undergoing overhaul.

13. During the 1990's, the Navy undertook a series of capital projects to segregate the utilities necessary for the operation of its business from other facilities. The purpose of the capital projects was to allow the Navy to be self contained and manage only the utilities associated with ongoing Navy missions as well as respond to emergencies (emergent needs) and to buildings and facilities in a preserved status. This utility segregation included the steam system.

14. The transfer of all functions related to utilities from the Government to PAID as set forth in the Contract was part of the process of the Department of Defense's closure of the Philadelphia Naval Base and Shipyard.

15. Philadelphia Naval Base, Naval Station and Shipyard were part of Base Realignment and Closure Commission (BRAC) decisions of 1991, 1993 and 1995.

16. Parts of the Shipyard were originally put in a "close and preserve" status for possible reactivation. This decision was changed in 1995, whereby some Government activities were to be retained within the former Naval Base and "islands" were created for Navy owned and operated facilitates. The primary activities included: NSWC, the largest activity; the Propeller Shop and Foundry; Naval Inactive Ships Maintenance Facility; and Navy's Public Works Center.

17. The Navy, under contract N62472-90C-0063, procured replacement boilers. These boilers were designed for an output of 150,000 lbs per hour and sized to replace older boilers and to include providing steam for the Navy including Dry Docks 4 and 5 which at that time were designated by the Navy for emergent Aircraft Carrier work.

18. As the BRAC process progressed, the City of Philadelphia, in particular the Commerce Department and the Philadelphia Industrial Development Corporation ("PIDC") started the planning process for the re-use and eventual transfer of the property. A Master Lease was signed in 1996 with the Navy that allowed PIDC, on behalf of the Philadelphia Authority for Industrial Development (PAID), to recruit and attract businesses to regain lost economic activity in the region as a result of the BRAC activities.

19. In 1997 and 1998, the three new boilers referenced above were installed. These boilers, like the boilers they replaced, were operated and maintained by the Navy Public

Works Center which was responsible for billing the Navy customers. Some buildings had steam meters; others were estimated using heat factors developed by the Navy (Wood's Study). Transfer of the property occurred in 2000 as work continued on the transfer of utilities.

20. As previously stated, the Navy undertook capital projects for the segregation of utilities. Eventually, the Navy was required to transfer all functions related to utilities. However, local Navy representatives objected to the privatization due to the potential loss of Government jobs. The Federal Government at that time had started an initiative of privatization of utilities at other Government facilities. The Navy had reduced their operating budget for maintenance and capital improvements related to these utilities.

21. In order to commence the utility transfer process, the Government issued a Request for Proposal ("RFP") for Utility Services on November 5, 1999.

22. The RFP issued by the Government provided limited general information about the utilities and primarily focused on the form of response and type of information needed by the Government. The RFP provided an estimate of steam consumed on an annual basis for each building and the Boiler Plant Utility Report (Monthly UCAR data for FY 99 [Oct 98-Apr 99].

23. Due to the limited substantive information provided in the RFP, PAID repeatedly requested more information from the Government, including but not limited to, operation logs and data required to perform financial analysis and engineering analysis such as a heat balance. Without such information it was impossible for PAID to verify the Government's estimates or understand the plant's operating efficiency or the operating efficiency of the steam system as a whole. In response to PAID's requests, on February 1, 2000, the Government

responded with limited and inadequate additional information concerning the steam utility service.

24. In addition to information supplied by the Government, an initial site visit was held on April 12, 2000, during which PAID and its prospective utility provider were provided access to the steam plant. The Government limited bidders to approximately one hour and 15 minutes in the power plant. During a subsequent visit PAID and its prospective utility provider sought to obtain more detailed information for due diligence purposes for their cost proposal and to do their risk assessment. At one point PAID's representative was assigned an escort by the Navy. During the second day of the visit, the escort told PAID's representative that they were prohibited from answering any more questions and later, a senior civilian for the Navy PWC, personally escorted PAID's representative out of the power plant. The Navy told PAID's representative that they had to leave for safety reasons, but never allowed PAID to return despite requests.

25. On June 6, 2000, again in search of more information so that PAID could verify the Government's estimated usage and achieve a better understanding of the overall steam system's history and trends, PAID requested more information. Specifically, PAID requested the following information for a twelve month period from the Navy:

a. Boiler plant operating room logs having information to evaluate fuel-to-steam efficiency and stack emissions;

b. Routine maintenance logs and records of major repairs for the boiler plant and the steam distribution systems;

c. Testing and calibration records for boiler plant instruments;

d. The existing revenue meter – identification number, location, and multiplier value for Navy Buildings' meters; and

e. Testing and calibration records for utility meters.

26. Despite PAID's June 6, 2000 request, the Government failed to provide PAID with the information necessary to verify the Government's steam usage estimates. In particular, the Government failed to provide the monthly bills it had issued to Government tenants based on metered readings and based on estimates where meters did not exist. Although this information would have allowed PAID to develop a trend based on a history of the Government's steam usage for each site, the information was not provided to PAID prior to Contract execution.

27. In lieu of the historical steam usage information PAID requested, the Navy's Jean Mann represented that the Navy typically produced 177,000 MBTU and consumed 116,000 MBTU annually. This information was to be used to determine fully allocated costs and the unit rate for steam. This information was not consistent with the Navy's estimate provided in the RFP.

28. With no ability to independently verify the Government's estimate of steam usage, PAID reasonably relied on the Government's estimate and entered into the Contract on August 31, 2001.

29. Immediately after Contract execution, the Government provided additional information including the Wood's Study created heat factors the Navy used for estimating steam consumption and a sample bill for the month of July 2001. This billing data could have been used to verify the Government's estimate of steam allowing PAID to develop a history and trend by building had the Government provided the data for a twelve month period.

30. According to the Government's estimates under Exhibit B to the Contract, the Government anticipated consuming 114,591 MBTU of steam per year. In the heating season of 2001-2002, the Government actually consumed 77,995 MBTU. In the heating season of 2002-2003, the Government actually consumed 90,375 MBTU. In the heating season of 2003-2004, the Government actually consumed 81,229 MBTU. In the heating season of 2004-2005, the Government actually consumed 75,923 MBTU. In total, for the first four years of the contract, the Government consumed 71% of the Government's estimated consumption.

31. It was not until PAID had its own readings of actual steam usage, that it realized that the Government's estimate was grossly inaccurate and not based on an analysis of the data which Government possessed when it developed the estimate.

32. PAID has learned that the Government possessed information, including but not limited to, a database known as Genesis, which would have resulted in more accurate steam production data, heat factor data used in estimating consumption and billing history that would have revealed the gross inaccuracies provided in the Government's RFP. Moreover, PAID has learned that the method the Navy used to estimated steam consumption was incorrect.

33. In meeting its contractual obligation to provide the steam utility service during the first four years of the contract, PAID incurred operating expenses of $3,941,212 greater than revenues collected from Government for the steam service utility. PAID losses were largely sustained due to the rate per MBTU of steam which was premised on the Government's inaccurate representation of steam consumption. PAID was unable to account for the actual amount of steam it would sell the government and the efficiency of operating the steam system at such a low capacity.

## COUNT I – BREACH OF CONTRACT – NEGLIGENT ESTIMATE OF STEAM REQUIREMENT

34. PAID incorporates paragraphs 1 through 33 as if fully stated herein.

35. As more fully set forth in the paragraphs above, the Government negligently prepared its estimate of steam requirements.

36. The Government possessed the historical billing data which should have been utilized to arrive at a more accurate estimate of its steam usage and should have alerted the Government to the gross inaccuracies in the provided steam consumption estimate.

37. The Government failed to use the historical billing data in preparing its estimate of steam usage provided in Exhibit B to the Contract. Instead, the Government provided estimated usage based on the Wood's Study, adjusted factors used to allocate steam costs and in a limited number of cases, metered data for steam which did not accurately represent the Government's historical steam consumption and failed to take into account the metered and estimated billing data the Government possessed showing actual usage in a given heating season.

38. Moreover, the Government used an incorrect method to arrive at the estimate of steam consumption.

39. PAID reasonably relied on the fact that the Government provided an estimate of steam consumption based all available information, employing proper diligence and correct methodology. PAID agreed to a steam utility rate premised upon this reliance.

40. As a direct result of the Government's negligent estimate of steam consumption, PAID was unable to account for the actual amount of steam that it would sell to the Government and inefficiencies associated with operating the system at a low capacity in calculating an acceptable steam utility rate.

41. In negligently estimating its steam usage under the Contract, the Government materially breached the Contract.

WHEREFORE, Plaintiff, the Philadelphia Authority for Industrial Development respectfully requests this Honorable Court grant judgment in its favor and against Defendant, the United States of America, as follows:

a. Monetary relief in such sums as the Court, based on evidence produced at trial, deems appropriate;

b. Statutory interest under the Disputes Act; and

c. Such other and further relief as the Court deems proper.

**COUNT II – BREACH OF CONTRACT – MISREPRESENTATION**

42. PAID pleads this count in the alternative.

43. PAID incorporates paragraphs 1 through 33 as if fully stated herein.

44. The Government made material representations as to the Navy's projected steam consumption. These representations were made through, including, but not limited to, the RFP, Exhibit B to the Contract, Jean Mann's representation regarding steam consumption and the express instruction to rely on that representation in arriving at a proposed steam rate.

45. PAID reasonably relied on the Government's representations.

46. The Government's material representations regarding steam consumption were erroneous.

47. As a direct result of the Government's misrepresentation, PAID was unable to account for the actual amount of steam that it would sell to the Government and inefficiencies associated with operating the system at a low capacity in calculating an acceptable steam utility rate.

48. By making various misrepresentations, the Government materially breached the Contract.

WHEREFORE, Plaintiff, the Philadelphia Authority for Industrial Development respectfully requests this Honorable Court grant judgment in its favor and against Defendant, the United States of America, as follows:

a. Monetary relief in such sums as the Court, based on evidence produced at trial, deems appropriate;

b. Statutory interest under the Disputes Act; and

c. Such other and further relief as the Court deems proper.

**COUNT III – BREACH OF CONTRACT – DEFECTIVE SPECIFICATION**

49. PAID pleads this count in the alternative.

50. PAID incorporates paragraphs 1 through 33 as if fully stated herein.

51. The Government made a positive representation to PAID as to its typical production and consumption of MBTU annually. These representations were made through, including, but not limited to, the RFP and Exhibit B to the Contract.

52. The Government's representation as to the typical production and consumption of MBTU annually was a material aspect of the Contract.

53. PAID made repeated requests to the Government to provide PAID with the information necessary to verify the Government's steam usage estimate.

54. PAID had no reasonable means of making an independent investigation of the Government's steam usage estimates.

55. The Government's representation later proved to be false and misleading due to either actual misrepresentation on the part of the Government or, by what amounted to a misrepresentation through either gross mistake or arbitrary action on the part of the Government.

56. As a result of Government's misrepresentation, PAID suffered financial harm and incurred operating expenses greater than revenues collected from the Government for the steam service utility due to its reliance on the misrepresentation in the bidding and performance of the contract.

57. By making various misrepresentations, the Government materially breached the Contract.

WHEREFORE, Plaintiff, the Philadelphia Authority for Industrial Development respectfully requests this Honorable Court grant judgment in its favor and against Defendant, the United States of America, as follows:

a. Monetary relief in such sums as the Court, based on evidence produced at trial, deems appropriate;

b. Statutory interest under the Disputes Act; and

c. Such other and further relief as the Court deems proper.

**COUNT IV – BREACH OF CONTRACT – SUPERIOR KNOWLEDGE**

58. PAID pleads this Count in the alternative.

59. PAID incorporates paragraphs 1 through 33 as if fully stated herein.

60. PAID undertook to perform under the Contract without vital knowledge of the Government's actual past usage of steam.

61. This vital knowledge includes, but is not limited to, Government historical billing data which would have allowed PAID to develop a history and trend for the Government steam usage.

62. The Government was aware that PAID did not have access to vital information, including but not limited to, Government historical billing data and the Genesis database, and refused to provide such data to PAID. Moreover, because PAID had continually

requested more information, the Government knew that PAID was not aware of and could not otherwise obtain this vital information.

63. The information supplied by the Government prior to execution of the Contract misled PAID as to the actual steam consumption of the Government.

64. PAID's inquiries for further information as to steam consumption were never sufficiently answered and the Government never provided the vital information necessary for PAID to determine the Government's actual past steam usage and therefore accurately project future steam usage.

65. The Government did, in fact, possess information that would have allowed PAID to determine the Government's actual steam usage.

66. Consequently, PAID agreed to a steam utility rate premised upon inaccurate anticipated steam consumption of the Government. PAID was unable to account for the actual amount of steam that it would sell the Government and inefficiencies associated with operating the system at a low capacity in calculating an acceptable steam utility rate.

67. Based on the foregoing, the Government materially breached the Contract.

WHEREFORE, Plaintiff, the Philadelphia Authority for Industrial Development respectfully requests this Honorable Court grant judgment in its favor and against Defendant, the United States of America, as follows:

a. Monetary relief in such sums as the Court, based on evidence produced at trial, deems appropriate;

b. Statutory interest under the Disputes Act; and

c. Such other and further relief as the Court deems proper.

**COUNT V – BREACH OF CONTRACT – MUTUAL MISTAKE**

68. PAID pleads this count in the alternative.

69. PAID incorporates paragraphs 1 through 33 as if fully stated herein.

70. The Government and PAID entered into the Contract under the belief that the Navy typically produced 177,000 MBTU and consumed 116,000 MBTU annually.

71. The estimate later proved grossly erroneous.

72. Both the Government and PAID were mistaken in their belief regarding the typical production and consumption of MBTU.

73. The mistaken belief regarding the typical production and consumption of MBTU constitutes a basic assumption underlying the Contract entered into on August 31, 2001.

74. The mistaken belief had a material effect on the Contract.

75. In meeting its contractual obligation to provide the steam utility service during the first four years of the contract, PAID incurred operating expenses greater than revenues collected from the Government for the steam service utility.

76. PAID is not responsible for the gross inaccuracy in the Contract's statement of anticipated steam consumption.

77. The parties' mutual mistaken in their belief regarding production and consumption of MBTU by the Government had a material effect on PAID's contractual performance.

78. Due to the parties' mutual mistake, reformation of the Contract is proper.

WHEREFORE, Plaintiff, the Philadelphia Authority for Industrial Development respectfully requests this Honorable Court grant judgment in its favor and against Defendant, the United States of America, as follows:

a. Monetary relief in such sums as the Court, based on evidence produced at trial, deems appropriate;

b. Statutory interest under the Disputes Act; and

c. Such other and further relief as the Court deems proper

**COUNT VI – BREACH OF CONTRACT – FAILURE TO PROVIDE NOTICE OF CONVERSION TO ALTERNATE HEAT SOURCE**

79. PAID incorporates paragraphs 1 through 33 as if fully stated herein.

80. The Contract states: "During the initial three (3) years of the Contract, the Government agrees that it shall not convert any Government-occupied building to another heat source, without prior notice to, and written approval of Contractor. After the initial three years of this Contract, the Government may convert to an alternative heat source, provided that, the Government provides prior written notice of not less than one hundred eighty (180) days and it further converts all Government-occupied buildings to another heat source, the Contractor shall be given an opportunity to propose a conversion plan for the Government to review and consider." Contract ¶ V(2)(d).

81. The Government deleted service at eight buildings during the 01-02, 02-03 and 03-04 heating seasons.

82. The Government failed to provide notice of these deletions as it was required to do under the Contract.

83. The Government's failure to provide notice of steam utility service deletions precluded PAID from timely recalculation of its steam utility rate so that PAID was not able to recover its fixed costs associated with the production of steam under the Contract.

84. In failing to provide notice of steam utility service deletions, the Government materially breached the Contract.

WHEREFORE, Plaintiff, the Philadelphia Authority for Industrial Development respectfully requests this Honorable Court grant judgment in its favor and against Defendant, the United States of America, as follows:

a. Monetary relief in such sums as the Court, based on evidence produced at trial, deems appropriate;

b. Statutory interest under the Disputes Act; and

c. Such other and further relief as the Court deems proper.

**COUNT VII – BREACH OF CONTRACT – FAILURE TO PAY FOR NON-POTABLE WATER**

85. PAID incorporates paragraphs 1 through 33 as if fully stated herein.

86. The Contract states: "Non-Potable water shall be provided to non-potable fire hydrants and sprinkler systems only on an as-needed basis. The cost to deliver non-potable water is included in the price of steam and potable water." Contract ¶ V(5).

87. In a March 14, 2001 letter from the Government, PAID was instructed by the contracting officer not to include non-potable water in the steam utility rate. PAID obliged, but failed to include non-potable water as separate fixed-cost item in PAID's bills to the Government.

88. Despite notice of this billing error, the Government has refused to pay for the non-potable water supplied by PAID to the Government as the Government is required to do under the Contract.

89. In failing to make payment for the non-potable water supplied by PAID, the Government materially breached the Contract.

WHEREFORE, Plaintiff, the Philadelphia Authority for Industrial Development respectfully requests this Honorable Court grant judgment in its favor and against Defendant, the United States of America, as follows:

a. Monetary relief in such sums as the Court, based on evidence produced at trial, deems appropriate;

b. Statutory interest under the Disputes Act; and

c. Such other and further relief as the Court deems proper.

Respectfully submitted,

Sean P. Bamford
Pepper Hamilton LLP
Hamilton Square
600 Fourteenth Street, N.W.
Washington, D.C. 20005-2004
(202) 220-1200

Of Counsel

Kenneth I. Levin
Michael P. Subak
Joseph T. Imperiale
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4000

Attorneys for Plaintiff,
PHILADELPHIA AUTHORITY FOR
INDUSTRIAL DEVELOPMENT

August 23, 2007



#8812340 v2