# In the United States Court of Federal Claims

No. 07-628C
(Filed: January 6, 2014)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| PHILADELPHIA AUTHORITY FOR INDUSTRIAL DEVELOPMENT, | \* \* \* | Misrepresentations; Negligent Estimates; Summary Judgment; |
| Plaintiff, | \* \* | Genuine Issues of Material Fact; CDA; Negotiated Utility Service |
| v. | \* \* | Contract |
| THE UNITED STATES, | \* \* | |
| Defendant. | \* \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Kenneth I. Levin, Philadelphia, PA, for plaintiff.

Devin A. Wolak, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

    In this action for breach of contract arising from the United States Department of the Navy's ("Navy" or "defendant") sale of its steam plant to the Philadelphia Authority for Industrial Development ("PAID" or "plaintiff"),[1] plaintiff seeks an award of money damages based upon the alleged misrepresentations or negligent estimates provided by defendant to plaintiff concerning defendant's historical costs for and consumption of steam. Defendant filed a motion to dismiss, or in the alternative, for summary judgment. The court finds that genuine issues of material fact remain for five counts of plaintiff's six-count amended complaint regarding what defendant knew at the time it issued its solicitation, whether defendant negligently or deliberately provided inaccurate or misleading information to plaintiff, and the extent to which plaintiff relied on the data provided by defendant. Consequently, the court grants in part and denies in part defendant's motion.

## I. BACKGROUND

    In 1990, Congress enacted Public Law 101-510, the Defense Base Closure and Realignment Act of 1990, which, among other things, directed the Navy to downsize and dispose of excess properties. Among the properties identified by the Navy for closure were the Naval

---

    [1] Specifically, PAID entered into a contract with the Navy's Atlantic Division, Naval Facilities Engineering Command.

Station Philadelphia and the Philadelphia Naval Shipyard ("Naval Base").  Despite closure designations for the properties, the Navy planned to maintain two facilities at its former Naval Base:  the Naval Surface Warfare Center Carderock Division-Ship Systems Engineering Station and the Naval Foundry and Propeller Center.  As a result, the Navy would become the tenant of the new owner.

The City of Philadelphia became the owner of the Naval Base and established plaintiff as its redevelopment authority to develop and manage the Naval Base under its new name, the Philadelphia Naval Business Center ("PNBC"), commonly known as "The Navy Yard."  Plaintiff would be the sole provider of utility service to the PNBC.  On March 31, 1999, plaintiff and defendant entered into a purchase agreement whereby the Navy agreed to convey to plaintiff essentially all of the real property and improvements at the former Naval Base.  PA 45-63, 67.[2] Contemporaneously, the parties entered into a related agreement – the Utilities Agreement.

The dispute giving rise to this litigation centers on the March 31, 1999 Utilities Agreement, which, among other things, obligated defendant to convey to PAID all of the Navy's utilities systems at the Naval Base as well as negotiate utility agreements, a process that culminated in the August 31, 2001 Utilities Service Contract.  PA 67-73; DA 252-58.  The utility systems that provided electricity, natural gas, potable water, non-potable water, sewer, storm sewer, and, most relevant to this litigation, steam, were to be transferred to plaintiff and negotiated utility agreements were to be accomplished before April 1, 2000, PA 69; DA 254, but the date for consummation of the agreements subsequently was extended by eighteen months to August 31, 2001.[3]

The transfer of the utility systems to plaintiff expressly was made conditional, however, on an provision that imposed a ceiling on the rate PAID could charge for providing utility services to the Navy:

> The service agreements shall include provisions normally a part of agreements covering such utility services in that particular industry and shall establish mutually acceptable rate design and other rate and service principles, and they shall describe the nature of the service to be rendered, the term of the agreement, and other terms and conditions typical in and appropriate to such agreements, including mutually acceptable termination clauses without penalty to either party.  The parties agree that the utility rates to be paid by the Government for the commodity and system maintenance will

---

[2] Throughout this opinion, the court uses "PA ___" to refer to attachments to plaintiff's response to defendant's motion to dismiss, and "DA ___" to refer to attachments to defendant's motion to dismiss.  In many instances, the parties appended the identical material, and the court cites to either, or both, of their submissions.  Citations to the amended complaint appear as "Am. Compl. ¶ ___."

[3] The parties memoranda agree that the date was extended to August 31, 2011, but do not provide the documents reflecting the extension.

be at least as favorable as the rates charged by PAID to other customers under like conditions of service, <u>but in no event higher than the Government's fully allocated cost to the Government immediately prior to the transfer of service</u>, such rate to remain in effect for a mutually agreed time period.

PA 68 (emphasis added).

On November 5, 1999, the Navy issued a sole-source Request for Proposal ("RFP") to plaintiff for the procurement of utility services. PA 74-203. The RFP asked plaintiff to propose a rate structure that provided for a fixed rate for operation and maintenance services for a three-year period and a pass-through rate reflecting the variable cost for commodities such as fuel, electricity, and water. PA 77-78. As part of its preparations for its bid proposal, PAID issued its own RFP to hire a utility vendor to serve as its subcontractor to operate the utility systems at the PNBC. DA 275-304.

Ultimately, in November 2000, plaintiff selected Cinergy Solutions of Philadelphia, LLC ("Cinergy") as its subcontractor to provide operation and maintenance services for the PNBC's utility systems. PA 206-20. On December 4, 2000, plaintiff submitted its proposal in response to the Navy's RFP. PA 221-301. Plaintiff's proposed steam rate consisted of two separate parts – a fixed steam facilities charge and a variable steam consumables charge. PA 224-25. The steam facilities charge consisted of the amount Cinergy would receive as compensation for its services and a one percent administrative fee for PAID. <u>Id.</u>

Defendant raised several concerns with PAID's December 4, 2000 proposal and requested supporting information from PAID, which it provided. PA 302-07. It is worthy of note that both during PAID's search for a utilities subcontractor and after selecting Cinergy, plaintiff requested additional information from defendant to assist PAID in its preparation of PAID's response to defendant's RFP.[4] The parties exchanged correspondence and held meetings as they continued their negotiations. On March 2, 2001, plaintiff wrote to defendant summarizing the parties' discussions at a meeting held the previous day. PA 308-18. In its letter, plaintiff explained that its proposed pricing for the steam facilities charge had been developed without access to the Navy's actual historical records:

---

[4]   Plaintiff made at least three inquiries of defendant for information concerning the utilities systems at the Naval Base. Am. Compl. ¶ 26. First, by letter dated December 30, 1999, John Grady, plaintiff's head of Naval Base development, requested from defendant information related to the steam system and the Navy's requirements regarding the quality of steam to be delivered. DA 261-68. Six months later, in June 2000, plaintiff again sought information regarding the utility system, including steam system boiler operating logs so it could evaluate "fuel-to-steam efficiency and stack emissions." DA 271-72. Plaintiff's third request was made on September 7, 2001, when PAID sought, among other things, a monthly breakdown of defendant's cost to purchase steam for each of its facilities for a twelve-month period. DA 305-06.

> The Navy RFP requested a fixed price for operation and
> maintenance of the utilities systems.  We provided this.  Under our
> proposal, PAID and its operators are taking the risk that the
> [Operation & Maintenance] can be accomplished for that overall
> price.  If the cost to maintain the systems is greater than what
> PAID has set forth in its Proposal, we bear that cost and the Navy
> does not.  The Navy must keep in mind that PAID and its operators
> developed these budgets and fixed prices with <u>no operating
> experience and based on no operating history, in large part because
> the Navy refused or was unable to provide maintenance logs and
> relevant repair history.</u>  These budgets were developed by experts
> based on their experience operating similar systems.  In return for
> taking this risk, we need the flexibility to operate the entire system,
> as an integrated distribution system, in the most efficient manner
> possible.

PA 310; DA 336.  Plaintiff's frustration with the Navy's stance of requesting but not sharing
information with PAID was apparent in this same correspondence:

> The Navy has never once indicated that any of the overall rates are
> too high.  Rather it has questioned detailed line items that make up
> the overall rate.  <u>If the Navy has a rate it must achieve, based upon
> the standard set forth in the Utilities Agreement, then give us that
> number and we will respond accordingly.</u>  What we can't do is
> respond piecemeal to individual points in the PAID proposal.

PA 310; DA 336 (emphasis added).  At this point in the parties' negotiations, the annual fixed
charge for the operation and maintenance of the system was the lone risk factor because PAID's
proposal contemplated that the variable costs would be passed through to the Navy each month
as the actual costs were incurred.  <u>See</u> PA 310; DA 336.

Defendant responded by letter dated March 14, 2001.  PA 314-18; DA 340-44.  In its
letter, the Navy contended that plaintiff's proposal had not been responsive.  PA 314-15; DA
340-41.  Specifically, defendant asserted that plaintiff's proposal "greatly exceed[ed the] Navy's
fully allocated costs," which would violate the Utilities Agreement.  PA 314; DA 340.
Defendant also provided plaintiff with the "Navy's fully allocated costs for [its] review," and
attached a worksheet, that included quantities of steam produced and consumed on a yearly
basis, along with a formula for converting these numbers into the costs.  PA 316-18; DA 342-44.
The worksheet indicated that the Navy produced 177,000 MMBtu of steam per year at the site
and consumed 116,000 MMBtu per year.[5]  PA 316; DA 342.  The worksheet also reflected that
the "Navy's fully allocated fixed cost for steam is $1,114,470 annually, as compared to PAID's
proposed fixed costs of $1,638,240."  PA 316; DA 342.  The Navy explained that it was
providing the cost information to plaintiff "in anticipation that, in accordance with the Utilities

---

[5]  The abbreviation MMBtu stands for "one million British thermal units," a measurement
of heat produced.  Def.'s Mot. 2 n.1.

Agreement, PAID's costs will not exceed [the] Navy's fully allocated costs." PA 314-15; DA 340-41.

Plaintiff responded on March 27, 2001, taking issue with some of defendant's assumptions and proposing numbers regarding fixed costs and adjustments to the cost for operation and maintenance for steam. PA 319-23; DA 345-50. Plaintiff explained that the "Utilities Agreement, dated March 30, 1999,[6] clearly requires the Navy to compare PAID's proposal to the Navy's fully allocated cost 'immediately prior to transfer of service.'" PA 319; DA 345 (footnote added). Plaintiff explained that it understood the figures in defendant's March 14, 2001 letter to be estimates of fully allocated costs, not actual figures, and requested that defendant provide actual operating expenses. PA 319-20; DA 345-46.

On April 9, 2001, defendant sent to plaintiff, via electronic mail, a spreadsheet that compared three years of plaintiff's projected costs from its proposals with the Navy's costs. PA 324-26. Defendant again indicated that, per year, it had consumed 116,000 MMBtu of steam, but now indicated that its fixed costs for steam totaled $1,268,064. PA 325. The worksheet also provided a cost breakdown indicating that the Navy's total per unit cost for steam was $24.05. Id.

That same day, plaintiff sent a memorandum to defendant explaining that its subcontractor, Cinergy, would not agree to a transfer of the utilities without the inclusion of the steam plant. DA 368-71. Plaintiff included this requirement in its offer to the Navy despite defendant's prior advice that PAID's proposal to provide steam exceeded the cost of the Navy continuing to maintain the utility system itself and that half of the cost overrun was attributable to steam operations. DA 368. Plaintiff maintained that without the steam operations or a long-term contract, the contract would be too risky. Id.

By letter dated April 12, 2001, defendant responded to PAID's April 9 memorandum.[7] In its letter, defendant explained that it could not accept plaintiff's proposal because "PAID's latest proposal . . . does not meet the requirements in the Utilities Agreement of March 1999 for matching [the] Navy's fully allocated costs to own and operate the system." PA 328; DA 373. Defendant voiced its objection that plaintiff's proposal for steam passed all operating costs along to the Navy, and therefore plaintiff would have no incentive to hold down costs. PA 329; DA 374. Defendant also noted the cogeneration capability of the steam plant, which could also produce electricity, and expressed its concern for the possibility that plaintiff could use the steam plant to generate pure profit by running the steam plant to generate electricity, but charging the steam operating costs fully to defendant. PA 329; DA 374. Finally, defendant expressed its disagreement with plaintiff's plan to staff and operate the steam plant on a year-round basis

---

[6] Although the letter recites that the utilities agreement is dated March 30, 1999, there is no dispute that the agreement is dated March 31, 1999.

[7] Both copies of this letter provided by the parties are incorrectly paginated as: pages one, four, two, three, and five. The court cites to the page numbers assigned by the parties and as numbered in their respective appendixes.

because, historically, defendant only operated and staffed the steam plant during five-and-one-half months of the year. PA 329; DA 374. Defendant, therefore, counterproposed a fixed rate of $24 per MMBtu for steam produced, claiming that that price was "based on historic past performance with this plant." PA 330-31; DA 373. Defendant also proposed that the rate be adjustable after three years to reflect inflation. PA 328; DA 373.

Just over a week later, on April 20, 2001, plaintiff responded to the Navy's request for a $24 per MMBtu fixed rate for steam as follows:

> The Navy has requested that PAID provide steam to the Navy retained facilities at a fixed price of $24.00 per MMBtu. <u>PAID and Cinergy have adjusted their operating strategy for the steam plant</u> in order to meet the Navy's requirements. This strategy is based on certain operating assumptions about the boiler plant that were provided to us by the Navy. <u>As PAID and Cinergy have no operating experience with the boiler, we must rely on the Navy's representations in order to offer this fixed price.</u>

PA 333; DA 380 (emphasis added). Thus, in agreeing to the Navy's request for the cost of steam to be provided at the fixed rate of $24 per MMBtu, plaintiff makes clear that the basis for the agreement was its reliance on the Navy's representations regarding operating and production costs as well as the Navy's anticipated demand for utility services. The letter also sought eleven other conditions, including a minimum five-year term for the contract, a minimum consumption guarantee, and detailed operating standard warranties, especially for boiler and system efficiency. PA 333-34; DA 380-81.

Defendant responded to plaintiff on April 25, 2001, agreeing that "the steam rate should be indexed to future increased fuel costs as proposed by PAID," but rejecting plaintiff's request that the contract provide for minimum consumption, a minimum term of the agreement, and specific operating standards. PA 338-40. With respect to the steam plant, defendant rejected the minimum guarantees, but claiming that the "Navy calculated the proposed flat-rate for steam based on actual costs to operate the plant adjusted to allow for increased cost of fuel . . . ." PA 340. Nowhere in its April 25 letter did the Navy qualify or retract its commitment regarding the accuracy of the historical consumption data that it had provided to plaintiff in support of its demand for a $24 per MMBtu fixed rate for steam.

With the parameters of an agreement taking shape, plaintiff reexamined its cost estimates to determine whether it could accept the agreement without minimum consumption guarantees. After concluding its internal deliberations, plaintiff's representatives determined that although PAID would incur annual losses on the steam side, PA 531,[8] plaintiff would agree to the $24 per

---

[8] At her deposition, plaintiff's contract negotiator, Sharon Barr, testified that plaintiff expected to incur a loss of about $100,000-160,000 annually on the steam side. PA 531; DA 452; <u>see also</u> DA 392 (internal electronic mail from Ms. Barr stating: "[Y]es, clearly we knew the steam was a loser and hoped that the electric would subsidize the steam. But as you know, [we] thought the losses would be around $300K for 3 years then we would get off the system.").

MMBtu flat rate because control of the utility systems was essential to develop the entire Naval Base area in the way that plaintiff desired.  PA 502; DA 474-80.

The parties executed Utility Service Contract N62470-99-C-3633 ("contract") on August 31, 2001, DA 1-248, thus fulfilling the terms of the March 31, 1999 Utilities Agreement, see PA 67-73; DA 252-58.  Exhibit B of the contract estimates that defendant would use 114,591 MMBtu of steam per year and that the steam service would be provided at twenty-eight locations.  DA 80-109.  Importantly, each point of service specification also states:  "The Government is in no way obligated to deliver nor is it restricted to the above noted estimates." Id.

The contract also provides a mechanism whereby buildings no longer needing steam could have their service cut off:

> 52.241-11     MULTIPLE SERVICE LOCATIONS (FEB 1995)
>
> (a)  At any time by written order, the Contracting Officer may designate any location within the service area of the Contractor at which utility service shall commence or be discontinued.  Any changes to the service requirements shall be made a part of the Contract by the issuance of a modification hereto to include the name and location of the service, specifying any different rate, the point of delivery, different service specifications, and any other terms and conditions.
>
> (b)  The applicable monthly charge specified in this Contract shall be equitably prorated from the period in which commencement or discontinuance of service at any service location designated under the Service Specifications shall become effective.

DA 31.

Beginning with the heating season of 2001-2002, plaintiff began providing steam service to heat defendant's buildings.  Eventually, plaintiff found a large discrepancy between the volume of steam defendant actually consumed and the historical production record provided by defendant to plaintiff during the parties' negotiations.  DA 486.  Similarly, plaintiff identified a large variation between the amount of steam the plant was required to produce to achieve operational efficiency as compared with the production estimates provided by defendant to plaintiff during the parties' negotiations.  Id.  Plaintiff determined that there was a large difference between the amount of steam lost in operating the plant and the amount of steam it had to produce as compared to defendant's estimates.  See Am. Compl. ¶¶ 37-40.  Thus, the cost of providing steam to defendant was creating a "significant loss" and plaintiff actively sought ways to reduce the loss by removing certain properties from the combined steam system and shifting to more localized package boilers.  DA 483-86.

In addition to its operational efforts to reduce losses, plaintiff sought an equitable adjustment to the contract. DA 396-427. Plaintiff requested an adjustment in the amount of $2,151,211.60 because the costs to provide steam to defendant were higher than expected due to defendant's lower than estimated consumption of steam, lower than expected steam plant efficiency, and a lack of compensation for providing nonpotable water. Plaintiff also sought $600,621 for the misrepresentation of steam system efficiency and $527,986.82 attributable to the under consumption of steam, which reduced the boiler's efficiency even more.[9]

On November 15, 2005, the contracting officer denied plaintiff's request for an equitable adjustment. DA 428-30. After plaintiff requested the equitable adjustment be converted to a Contract Disputes Act claim on November 28, 2005, the contracting officer issued a final decision denying the claim in its entirety on February 8, 2007. DA 438-45.

Plaintiff timely filed suit in this court on August 23, 2007. The parties engaged in discovery and plaintiff received responsive documents from defendant demonstrating that, despite the Navy's representations during contract negotiations, defendant actually produced 235,035 MMBtu during the winter of 1999-2000 and that it consumed 95,464 MMBtu of steam that same season.[10] PA 204-05. Defendant did not use these numbers when it provided plaintiff with estimates of its steam needs on April 9, 2001, instead estimating that it would produce 177,000 MMBtu of steam per year at the site and would consume 116,000 MMBtu per year. PA 316; DA 342.

On June 1, 2011, the court granted plaintiff's motion for leave to file an amended complaint, which was filed on July 21, 2011. The amended complaint included six counts. In Count I, plaintiff alleges that defendant recklessly and negligently prepared its estimate of steam consumption and revenues, and that it reasonably relied upon those estimates in agreeing to the contract price of $24 per MMBtu of steam produced. In Count II, plaintiff asserts in the alternative that defendant materially breached the utilities contract by misrepresenting the estimates of steam production and consumption to induce plaintiff to agree to the $24 per MMBtu price. In Count III, plaintiff argues that the Navy's estimates of steam consumption and production, which it provided to plaintiff on April 9, 2001, were defective specifications. In Count IV, plaintiff sets forth a theory of recovery pursuant to the superior knowledge doctrine. In Count V, plaintiff avers that both parties were mutually mistaken as to the true nature of defendant's steam needs, and therefore reformation of the contract would be appropriate. Finally, in Count VI, plaintiff alleges that it is entitled to a rate adjustment under the terms of the contract because several buildings originally listed in Exhibit B of the contract no longer receive steam from the steam system.

---

[9] Plaintiff also sought $169,509.75 for providing nonpotable water, but dropped its request for compensation for nonpotable water in this court.

[10] Plaintiff also received in discovery a worksheet indicating that in the winter of 2000-2001, defendant actually produced 173,303 MMBtu of steam and consumed 105,371 MMBtu that same season. PA 444-45.

Defendant moves to dismiss the complaint for failure to state a cause of action under which relief can be granted as to counts III, IV, and V.  Defendant also moves for summary judgment in its favor as to counts I, II, III, IV, and VI.[11]  The parties have completed briefing the issues raised by defendant's motion and the court deems oral argument unnecessary.

## II.  DISCUSSION

### A.  Failure to State a Claim Standard

Defendant has moved in part for dismissal for failure to state a claim pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").  "A complaint must be dismissed under Rule 12(b)(6) when the facts asserted do not give rise to a legal remedy."  Indian Harbor Ins. Co. v. United States, 704 F.3d 949, 954 (Fed. Cir. 2013) (citing Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).  "When considering an RCFC 12(b)(6) motion, the court "must determine 'whether the claimant is entitled to offer evidence to support the claims,' not whether the claimant will ultimately prevail."  Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v Fitzgerald, 457 U.S. 800, 814-19 (1982)).  "[T]he consequence of a ruling by the court . . . that plaintiff's case does not fit within the scope of the [money-mandating] source . . . is simply this: plaintiff loses on the merits for failing to state a claim on which relief can be granted."  Jan's Helicopter Serv. v. United States, 525 F.3d 1299, 1307 (Fed. Cir. 2008) (alteration in original); see also RhinoCorps Co. v. United States, 87 Fed. Cl. 481, 492 (2009) ("A motion made under Rule 12(b)(6) challenges the legal theory of the complaint, not the sufficiency of any evidence that might be adduced.").

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim of relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2006)).  "Deciding whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 678 (citing Twombly, 550 U.S. at 556).  Neither allegations "that are 'merely consistent with' a defendant's liability," nor "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are sufficient.  Id.

"The court assumes all well-pled factual allegations are true and indulges in all reasonable inferences in favor of the nonmovant."  Terry v. United States, 103 Fed. Cl. 645, 652 (2012) (citing United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006)).

---

[11]  Defendant also suggests that the court lacks jurisdiction over Count I of the complaint because the allegedly negligent estimates were prepared before the contract was signed. However, defendant does not argue this position as an independent ground for dismissal and the court is satisfied that there is jurisdiction because the data was made part of Exhibit B to the contract.

The court is "not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

## B. Summary Judgment Standard

Defendant has moved in part for summary judgment pursuant to RCFC 56. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. Id. at 324. Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the court must not weigh the evidence or make findings of fact. See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swish, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues."). Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

## C. Count III of the Amended Complaint Must Be Dismissed

In its response to defendant's motion, plaintiff fails to address defendant's arguments that Count III of its amended complaint, which advances a theory of liability based upon defective specifications provided by defendant, should be dismissed. The court construes plaintiff's silence regarding the merits of defendant's argument respecting Court III as PAID's concession

10

as to the validity of defendant's position.  Accordingly, plaintiff has waived its arguments respecting Count III, and the court need not consider it further.  Cardiosom, LLC v. United States, 91 Fed Cl. 659, 664 (2010) (noting that when a plaintiff fails to respond to an argument, the plaintiff "has effectively conceded the issue").  Thus, Count III of the amended complaint is dismissed.

### D.  Plaintiff Has Presented Allegations Sufficient to State a Claim for Superior Knowledge and Mutual Mistake

Defendant has also moved the court to dismiss Counts IV and V, arguing that plaintiff failed to state a claim upon which relief can be granted.  Count IV of the amended complaint alleges that plaintiff undertook to perform pursuant to the contract despite defendant's superior knowledge of the history of the operation of the steam plant that it withheld from plaintiff, leading to plaintiff's losses.  Count V of the amended complaint alleges that the parties were mutually mistaken as to the operating history of the steam plant when they agreed to the fixed rate of $24 per MMBtu of steam.

As the United States Court of Appeals for the Federal Circuit has explained:

> The doctrine of superior knowledge is generally applied to situations where (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

Hercules, Inc. v. United States, 24 F.3d 188, 196 (Fed. Cir. 1994); see also Scott Timber Co. v. United States, 692 F.3d 1365, 1373 (Fed. Cir. 2012) (citing Hercules).

Plaintiff's theory of superior knowledge rests on defendant providing to PAID, in April 2001, what the Navy claimed were the historical operating and consumption figures concerning steam at the Navy Yard.  According to plaintiff, despite its requests for this information during contract negotiations with the Navy, plaintiff did not receive accurate figures from defendant until it instituted suit in this court and served discovery requests on defendant.  Although defendant argues that plaintiff did not rely on the inaccurate information furnished by the Navy during the parties' negotiations, plaintiff sufficiently has alleged that it did so rely and documentary evidence provided to the court supports plaintiff's allegations.  See PA 333; DA 308 (letter from plaintiff to defendant accepting the $24 per MMBtu rate but stating: "[a]s PAID and Cinergy have no operating experience with the boiler, we must rely on the Navy's representations in order to offer this fixed price"); see also PA 531; DA 452 (deposition testimony of Ms. Barr in which she indicated that "based on the assumptions that [it was] using throughout the negotiations regarding efficiency and consumption" plaintiff expected to lose $100,000 per year in steam operations).  The amended complaint alleges that the actual costs of performance increased as more steam was required to be produced to meet the lesser quantity of

stream actually consumed by the Navy as compared to the data provided in the Navy's estimates. Such averments support plaintiff's theory of recovery based upon defendant's superior knowledge. Hercules, 24 F.3d at 196 (noting that a superior knowledge claim is "tenable where the government fails to provide a contractor with vital knowledge in the government's possession which bears upon the costs of the contractor's performance under the contract at issue"). The facts surrounding these questions cannot be weighed by the court on a motion to dismiss, but the court is satisfied that plaintiff is entitled to offer evidence to support its claim, see Chapman Law Firm Co., 490 F.3d at 938, and as discussed more fully below, this evidence must be weighed at trial. Thus, plaintiff may proceed with its superior knowledge claim.

In order for plaintiff to recover under Count V of the amended complaint, which advances the theory of mutual mistake, plaintiff must demonstrate: "(1) The parties to the contract were mistaken in their belief regarding a fact; (2) the mistaken belief constituted a basic assumption underlying the contract; (3) the mistake had a material effect on the bargain; and (4) the contract did not put the risk of the mistake on the party seeking reformation." Atlas Corp. v. United States, 895 F.2d 745, 750 (Fed. Cir. 1990). Reformation, rescission, and restitution all are available remedies in the case of a mutual mistake. Rosenberg Lumber Co. v. Madigan, 978 F.2d 660, 665 (Fed. Cir. 1992). In Count V of the amended complaint, plaintiff has alleged that the parties made a mutual mistake of fact regarding the historical consumption of steam on the base and that this mistake drastically increased the costs of plaintiff's performance such that it should be allowed to recover those costs through a reformed contract.

Defendant moves to dismiss Count V of the amended complaint, arguing that any alleged mistake did not go to a basic assumption of the contract. Defendant argues that the $24 per MMBtu fixed rate did not have separate components for operation and maintenance overhead and a variable component for the costs of fuel and other consumables; it was all one rate. Because plaintiff assumed the risk that one component would be able to offset or subsidize the other, defendant reasons, plaintiff took the risk that it would lose money on one aspect of its operations. Defendant also argues that plaintiff could not have reasonably assumed that the past operating status of the steam plant would continue unchanged into the foreseeable future, as plaintiff intended all along to ultimately to shut down the steam plant. Defendant is incorrect that plaintiff is foreclosed from stating a claim based on mutual mistake concerning the steam plant's history as a basic assumption of the contract.[12] In fact, in an April 20, 2001 memorandum sent as part of the negotiation where plaintiff agreed to the $24 per MMBtu rate, plaintiff explained: "This strategy is based on certain operating assumptions about the boiler plant that were provided to us by the Navy. As PAID and Cinergy have no operating experience with the boiler, we must rely on the Navy's representations in order to offer this fixed price." PA 333; DA 380. In addition, the rate was proposed by defendant "based on historical past performance with this plant." PA 328, DA 373. This correspondence suggests that both plaintiff and defendant made the basic assumption that the historical operating conditions would continue. In addition, the documentary evidence and deposition testimony presented to the court is, at this particular procedural juncture, sufficient to demonstrate that plaintiff's allegation that it had an

---

[12] Defendant, in this briefing, did not admit that the parties were mistaken as to the actual operating history of the steam plant. Thus, the existence of a mutual mistake also is a question to be decided in future proceedings.

expectation of the fixed rate of $24 per MMBtu rate leading to a limited loss. Plaintiff's averments and the evidence it offers to meet defendant's jurisdictional challenge under RCFC 12(b)(6) supports plaintiff's theory, therefore, the court may not dismiss Count V of the amended complaint for failure to state a claim upon which relief can be granted.

### E. Genuine Issues of Material Fact Exist as to Counts I, II, and IV

The crux of this case turns on whether defendant provided plaintiff with negligent estimates or made material misrepresentations concerning the cost of production of and consumption of steam by the Navy. Clearly, there is no question that the sole repository of the historical data regarding the Navy's steam production, consumption, and system efficiency resided with defendant. Plaintiff had no other source from which it could obtain this vital information other than the Navy. Both in the solicitation materials and in Exhibit B to the Utilities Service Agreement, defendant provided plaintiff with estimates of steam production and consumption that proved inaccurate. Moreover, as alleged in the amended complaint, during the critical period in April 2001, when the parties were negotiating the cost for utilities that PAID would charge the Navy, the Navy supplied additional inaccurate information in meetings with and correspondence to plaintiff. Specifically, PAID alleges that defendant supplied it with misleading information regarding the operating history of the steam plant at the Naval Base – including operating costs and volume of steam consumption. Plaintiff also avers that had defendant furnished it with accurate information, it would not have agreed to the fixed rate of $24 per MMBtu for steam.

Defendant's theory for dismissal relies heavily, as it plainly admits, on the theory that plaintiff knowingly and willingly assumed the risk that the steam plant would sustain losses when billing at a rate of $24 per MMBtu. According to defendant, summary judgment is appropriate under these facts because plaintiff expected to lose money on the steam service; thus, the actual amount of plaintiff's loss is irrelevant and cannot provide the basis for a cause of action against the government. In support of its argument, defendant relies on the deposition testimony of plaintiff's lead negotiator for the contract, Ms. Barr, who testified that during the course of negotiations and while contemplating the proposed rate plaintiff "concluded . . . that [it] would lose some money . . . and decided to take that risk." PA 531; DA 452. Defendant's motion emphasizes that during the parties' negotiations, plaintiff was represented by sophisticated representatives, plaintiff had experienced steam plant system operators who were skeptical of defendant's representations concerning its operating history, and that ultimately plaintiff made a business decision that it required the steam system to fully develop the former Naval Base. Thus, defendant concludes, plaintiff willingly and knowingly assumed the risk that a flat rate of $24 per MMBtu for steam would adequately compensate it to achieve its development goals, and therefore summary judgment is appropriate.

Plaintiff, however, has presented evidence that, at the time of contracting, it expected, based on information and data supplied by defendant, to lose only a finite amount on the contract. In fact, defendant's deposition of Ms. Barr illustrates that plaintiff only expected moderate annual losses:

Q.  Do you recall what kind of risk – could you describe the risk that you came to examine and analyze?

A.  We concluded that based on the assumptions that we were using throughout the negotiations regarding efficiency and consumption, that we would lose some money.  I can't remember the exact number, that there would be some loss – annual loss on the steam side and decided to take that risk.

Q.  You just said you can't remember the number.  Do you remember a ballpark figure?

A.  100,000 a year, something like that.

PA 531; DA 452; see also DA 392 (internal electronic mail from Sharon Barr stating:  "[Y]es, clearly we knew the steam was a loser and hoped that the electric would subsidize the steam. But as you know, [we] thought the losses would be around $300K for 3 years then we would get off the system.").  This deposition testimony demonstrates the existence of a genuine issue of material fact regarding what plaintiff's expectations were as to how much money it would lose on one portion of the contract and whether PAID knowingly assumed the risk that it might be expected to lose almost $800,000 per year in providing steam to the Navy, and therefore summary judgment is not appropriate.  The evidence also raises genuine questions of material fact as to exactly how much plaintiff relied upon defendant's estimates in agreeing to the $24 per MMBtu fixed rate for steam that forecloses the court granting summary judgment.

These issues of material fact are clearly relevant to the extent to which plaintiff relied upon defendant's representations in the contract's Exhibit B, the solicitation, and the April 9, 2001, communications concerning its historical production of steam.

Count I of the amended complaint alleges that defendant breached its contract with plaintiff by providing negligent estimates of the amount of steam to be produced and consumed by the Navy in the solicitation materials and in Exhibit B to the Utilities Agreement.  In Count II, plaintiff claims a breach of contract based upon defendant's misrepresentations in the solicitation materials of three key factors that influenced the ceiling on the rate PAID could charge for utility services and that ultimately led to the negotiated $24 unit rate:  the Navy's historical steam production, its steam consumption, and its system efficiency information.  Normally, the estimated quantities in a requirements contract are not guarantees or warranties that the contractor may rely upon.  Technical Assistance Int'l, Inc. v. United States, 150 F.3d 1369, 1372 (Fed. Cir. 1998).  However, if a contractor can demonstrate that an estimate made by the defendant was prepared negligently, in bad faith, or was grossly unreasonable, the defendant may be liable for breach of contract.  Medart, Inc. v. Austin, 967 F.2d 579, 581 (Fed. Cir. 1992); Clearwater Forest Indus., Inc. v. United States, 650 F.2d 233, 240 (Ct. Cl. 1981); Womack v. United States, 389 F.2d 793, 801 (Ct. Cl. 1968).  "[T]o the extent that a government estimate is inadequately or negligently prepared, its inclusion without correction in a solicitation or contract constitutes a misrepresentation that, whether deliberate or unintentional, amounts to a breach of

contract." Rumsfeld v. Applied Cos., 325 F.3d 1328, 1335 (Fed. Cir. 2003).  The rationale for this exception to the normal rule was explained by the United States Court of Claims:

> An estimate as to a material matter in a bidding invitation is an
> expedient.  Ordinarily it is only used where there is a recognized
> need for guidance to bidders on a particular point but specific
> information is not reasonably available.  Intrinsically, the estimate
> that is made in such circumstances must be the product of such
> relevant underlying information as is available to the author of the
> invitation.  If the bidder were not entitled to so regard it, its
> inclusion in the invitation would be surplusage at best or deception
> at worst.

Womack, 389 F.2d at 801 (citations omitted).

In this instance, the Utilities Agreement that guided the negotiation of the contract required that the rates for steam be no higher than defendant's "fully allocated costs" to run the system.  The information available to compute these costs was fully and exclusively within the control of defendant.  While defendant correctly notes that the cases discussing the negligent estimate theory normally arise in the context of bidding procurements, the rationale for allowing recovery applies with equal force in a negotiated procurement where, as here, defendant has total exclusive control over the required information.  See id.  If plaintiff can prove that it relied upon the estimates provided on April 9, 2001, in agreeing to the rate of $24 per MMBtu of steam, then it may be able to prevail at trial.

In short, genuine issues of material fact remain as to the extent plaintiff relied upon defendant's estimates of steam production and consumption, the amount of risk of loss plaintiff anticipated taking on based on the estimates provided, and the negligence or recklessness of defendant in preparing those estimates.[13]  Accordingly, defendant's motion for summary judgment as to Counts I, II, and IV must be denied.

### F.  Count VI May Entitle Plaintiff to a Rate Adjustment Under the Contract

Count VI of the amended complaint alleges that the Navy failed to issue proper contract modifications pursuant to 48 C.F.R. § 52.241-11, after certain buildings occupied by defendant were removed from steam service.  Am. Compl. ¶¶ 96-101.  According to plaintiff, the deletion

---

[13]  Plaintiff has presented information in its response that indicates that defendant had, in its possession, in April 2001, information on the actual quantities of steam used at the Naval Base that was significantly different from the numbers presented in the April 9, 2001 worksheet. Pl.'s Resp. 28; see also PA 204-05, 444-45 (copies of government worksheets showing actual utilities system operations at the close of Fiscal Years 2000 and 2001); PA 436, 490-94, 504-06 (expert reports and deposition testimony about the "Genesis system," which tracked actual consumption prior to and after 2001).  This evidence, presented and properly authenticated at trial, would be relevant to whether the estimates of steam presented by defendant on April 9, 2001, were negligently or recklessly prepared.

of steam service at various buildings entitles plaintiff to a rate adjustment, including possible adjustments to a higher rate to allow recovery of fixed operation and maintenance costs.

Relevant to this issue, the contract provides, as noted above:

> 52.241-11     MULTIPLE SERVICE LOCATIONS (FEB 1995)
>
> (a)  At any time by written order, the Contracting Officer may designate any location within the service area of the Contractor at which utility service shall commence or be discontinued.  Any changes to the service requirements shall be made a part of the Contract by the issuance of a modification hereto to include the name and location of the service, specifying any different rate, the point of delivery, different service specifications, and any other terms and conditions.
>
> (b)  The applicable monthly charge specified in this Contract shall be equitably prorated from the period in which commencement or discontinuance of service at any service location designated under the Service Specifications shall become effective.

DA 31 (quoting Federal Acquisition Regulations ("FAR") 52.241-11).  Contract provisions, including those incorporating specific provisions of the FAR, which the Multiple Service Locations provision does, are interpreted according to their plain language.  Lockheed Corp. v Widnall, 113 F.3d 1225, 1227 (Fed. Cir. 1997).  "It is firmly established as a general rule of contract interpretation that the 'interpretation that gives a reasonable meaning to all parts of the contract will be preferred to one that leaves portions of the contract meaningless.'"  Westfed Holdings, Inc. v. United States, 407 F.3d 1352, 1359 (Fed. Cir. 2005) (quoting United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983)).

Defendant argues that because there was no monthly service charge, only a flat fee per unit of steam consumed, the contract does not require a rate adjustment when several steam service points are deleted.  Defendant argues that section 52.241-11(a) does not provide for a rate adjustment of the entirety of the $24 per MMBtu rate because the provision is permissive, not mandatory, and points to the use of the word "any" to modify "different rate" in support of this interpretation.  Defendant also argues that 52.241-11(b) does not apply because there was no monthly charge that could be prorated.  Therefore, defendant argues, summary judgment in its favor or dismissal for Count VI is required.

Clearly, subparagraphs (a) and (b) of section 52.241-11 must be read as two independent provisions.  Because there was no monthly charge provision in the contract, only a fixed per unit charge, section 52.241-11(b) does not apply in this context and plaintiff is not entitled to recover under that provision.  In its reply memorandum, defendant argues that 52.241-11(a) is permissive, thus, the contracting officer's decision not to provide a rate adjustment was discretionary.  This limited issue has not been fully addressed by the parties and must be the subject of future briefing to allow the court to receive both parties' views respecting this issue.

Consequently, the court denies defendant's motion for summary judgment or dismissal as to Count VI without prejudice.  The court shall permit defendant to file a renewed motion with respect to Count VI if it so chooses.

### III. CONCLUSION

For the reasons set forth above, the court **GRANTS** defendant's motion to dismiss Count III of the complaint for failure to state a claim upon which relief can be granted and **DENIES** the remainder of defendant's motion to dismiss or, in the alternative, for summary judgment.

The parties shall confer to schedule future proceedings with regards to Counts I, II, IV, V, and VI of the amended complaint and file a status report proposing a schedule for further proceedings with the court **on or before Friday, February 14, 2014**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

17